Kermit LARSON, Dolores Larson, Wesley Boese, Irvin Boese, Melvin Solberg, Arthur Solberg, Gilmer Solberg, Al Dietz, Arden Georgeson, Ray Larson, Tillie Nelson, Everett Johnson, and the Heimdal Township Board, a public corporation, Plaintiffs and Appellants,

v.

WELLS COUNTY WATER RESOURCE BOARD, a public body, Defendant and Appellee.

Civ. No. 11035.

Supreme Court of North Dakota.

April 10, 1986.

Chapman & Chapman, Bismarck, for plaintiffs and appellants; argued by Daniel J. Chapman.

Dwyer & Klemin, Bismarck, for defendant and appellee; argued by Michael Dwyer.

LEVINE, Justice.

Twelve downstream landowners and the Heimdal Township Board [hereinafter collectively referred to as appellants] appeal from a district court judgment affirming a Wells County Water Resource Board [Board] decision approving a drain permit for the Heimdal Drain Project. We affirm.

In December 1979, several landowners petitioned the Board to establish the Heimdal Drain Project as an assessment drain pursuant to Section 61–21–10, North Dakota Century Code. Subsequently, the Board issued an order establishing an assessment drain known as Heimdal Drain A and B. The Heimdal Drain Project was designed to provide drainage for approximately 3,600 acres of land in Wells County into the Heimdal Slough, which is part of a water course which flows into a reservoir known as the Big Slough which, in turn, flows into the James River.

On June 9, 1981, and after the time for appeal from the decision establishing the assessment drain had expired, the Board submitted an application to the North Dakota State Water Commission for a drain permit for the Heimdal Drain pursuant to Section 61–01–22, N.D.C.C.[1] The State Engineer determined the application to be of statewide significance and referred the application to the Board for a public hearing.

After notice to all affected landowners, the Board held a public hearing on July 9, 1981. Several downstream landowners appeared at that hearing and opposed the application. Among the concerns expressed at the hearing were: (1) the possibility of flooding downstream land; (2) the effect on the Heimdal lagoon and water supply; (3) the adverse impact on township roads; (4) the possibility of running the drain south rather than north; (5) the control of culverts feeding into the drain; and (6) the outlet of the Big Slough into the James River.

The Board requested an engineer to investigate the effect of the drain on the Heimdal lagoon and water supply, and the possibility of running the drain south rather than north. The engineer responded by letter dated July 15, 1981, that it would not be economically feasible to route the drain south and that there would be little effect on the lagoon and water supply. The Board met on August 21, 1981, to consider the application and thereafter forwarded the application to the State Engineer.

The State Engineer conducted an independent engineering analysis of the proposed project and, subject to certain conditions, approved the drain permit application. The conditions included acquiring flowage easements for certain downstream land, installing gates on the downstream end of certain culverts to control the flow of water and protect downstream lands, and improving an outlet into the Big Slough to handle 350 cubic feet of water per second without causing an adverse impact on adjacent land. On March 17, 1982, the Board approved the permit with the conditions prescribed by the State Engineer. The appellants appealed that decision to the district court, and, after concluding that the Board's decision was not arbitrary, oppressive, or unreasonable, the district court affirmed that decision.

On appeal the appellants contend that the permit was invalid because flowage easements over downstream lands were not

1. Section 61–01–22, N.D.C.C., was repealed by the Legislature in 1981 and was recodified as Section 61–16.1–41, N.D.C.C., with minor changes not relevant to this appeal. 1981 N.D. Sess.Laws ch. 632, §§ 1, 11.

obtained *before* the permit was granted, as required by Section 61–16.1–41, N.D.C.C. (see fn. 1). The appellants contend that the language of that statute is mandatory.

The Board counters that the drain permit was contingent upon obtaining the necessary easements, and, thus, satisfies the statutory requirements of Section 61–16.1–41, N.D.C.C.

That section provides, in relevant part:

"*61–16.1–41. Permit to drain waters required—Penalty.* Any person, before draining water from a pond, slough, or lake, or any series thereof, which drains an area comprising eighty acres [32.37 hectares] or more, shall first secure a permit to do so. The permit application shall be submitted to the state engineer. The state engineer shall refer the application to the water resource district or districts within which is found a majority of the watershed or drainage area of the pond, slough, or lake for consideration and approval, but the state engineer may require that applications proposing drainage of statewide or interdistrict significance be returned to him for final approval. A permit shall not be granted until an investigation discloses that the quantity of water which will be drained from the pond, slough, or lake, or any series thereof, will not flood or adversely affect downstream lands. In addition, consideration shall be given to the state water resources policy set forth in section 61–01–26. *If the investigation shows that the proposed drainage will flood or adversely affect lands of downstream landowners, the water resource board shall not issue a permit until flowage easements are obtained.* [Emphasis added.]

■■■ Our canons of statutory construction require a statute to be construed to fulfill the objective and intent of the Legislature. *E.g., County of Stutsman v. State Historical Society of North Dakota,* 371 N.W.2d 321 (N.D.1985). A statute must be construed to avoid absurd and ludicrous results or to require idle or unnecessary acts. *Id.*

■■■ The plain language of this statute mandates that flowage easements be obtained if a drain will flood or adversely affect downstream landowners. The obvious purpose of requiring a flowage easement is to protect downstream landowners and insure that they receive just compensation in the event of flooding or an adverse impact on their land. The dispositive question is whether or not the conditional permit satisfies the statutory requirements.

In the instant case, the drain permit was approved upon the condition that flowage easements be obtained.[2] This condition simultaneously eliminates the potential of fruitless action and costs in obtaining an easement where a drain permit is not ultimately approved, while remaining faithful to the purposes of the flowage easements and their protection of downstream landowners. We conclude that the conditional drain permit issued in this case satisfies the statutory requirements of Section 61–16.1–41, N.D.C.C., and that the conditions did not invalidate the permit.

■■■ The appellants next contend that, because the minutes of the Board's August 21, 1981 meeting contain no record of the vote on a motion to approve the drain permit, the procedure for securing the drain permit was invalid.

The minutes of that meeting reflect that a motion was made and seconded, but do not record the actual vote on the application. The minutes state that the Board considered and determined that: (1) flowage easements were necessary over certain downstream lands; (2) downstream property would not be adversely affected; and (3) the quantity of water to be drained would not exceed the limitations of the drain and the receiving water course. The application was then forwarded to the State Engineer. The Board's action and the minutes

---

**2.** The Board has eminent domain authority pursuant to Section 61–16.1–09(2), N.D.C.C. Thus, approval of a conditional drain permit does not depend on voluntarily obtaining flowage easements.

necessarily imply that the application received favorable approval at this stage of the procedure. Any conceivable error was corrected when the application was returned to the Board on March 17, 1982, for its approval subject to conditions imposed by the State Engineer. The March 17, 1982 action was the final stage of the procedure from which the instant appeal was taken and the failure of the minutes of the August 21, 1981 meeting to state the actual vote on the motion does not invalidate the March 17, 1982 decision.

■ The appellants also raise two issues relating to the composition of the three-member Board. The appellants contend that Commissioner Jerrold Roble could not act on the drain permit application because he was not present at the July 9, 1981 protest hearing and was not a member of the Board at that time. Roble was appointed on July 15, 1981 to replace a deceased member of the Board.

In *Schultz v. North Dakota Department of Human Services,* 372 N.W.2d 888 (N.D. 1985), we concluded that an administrative officer need not actually hear witnesses testify or hear oral argument in order to render a decision, but that officer must consider and appraise the evidence before rendering a decision.

In the instant case, the record reflects that the protests at the July 9, 1981 hearing were part of the record in subsequent proceedings before the Board. A tape recording of the July 9, 1981 hearing was available as well as a copy of the minutes of that meeting. The material before the Board also included engineering reports and other documentary evidence dealing with the concerns expressed at the July 9, 1981 hearing, and Roble indicated that he had reviewed those materials and was aware of those concerns. In view of Roble's consideration of the material available to the Board, we believe his participation did not invalidate the application proceedings.

■ The appellants also contend that Board Chairman Norman Rudel leased land within the area to be drained by the Heimdal Drain and was a beneficiary of that drain. Their argument is that Section 61–21–04, N.D.C.C., required Mr. Rudel to disqualify himself. That section, which was repealed effective January 1, 1982, provided:

"*61–21–04. State and county officers not eligible as drain commissioners— Matters of personal interest to drain commissioners.* No person holding any state or county office, other than that of commissioner of a water management district, shall be eligible for the office of drain commissioner, and any drain commissioner accepting any state or county office, other than that of commissioner of a water management district, shall be deemed to have vacated the office of drain commissioner. *No member of the board [of drainage commissioners] shall be qualified to act as such in any matter or proceeding before the board [of drainage commissioners] in which he is personally or financially interested and the board of county commissioners shall appoint an alternate commissioner who shall act in the place of any disqualified or absent commissioner, but shall so act only upon matters in which a commissioner is disqualified or while a commissioner is actually absent from an entire meeting of the drainage board.*" [Emphasis added.]

Chapter 61–21, N.D.D.C., deals with the establishment of the assessment drain. It involves a separate and distinct procedure from that provided in Section 61–16.1–41, N.D.C.C., for securing a drain permit. Section 61–21–04, N.D.C.C., applied to the Board of Drainage Commissioners.[3] There

---

**3.** In 1981 the Legislature changed certain terminology with respect to water resource law. The Water Management District became the Water Resource District and the Board of District Commissioners became the Water Resource Board. Section 61–21–04, N.D.C.C., referred to the Board of Drainage Commissioners which was a separate statutory entity from the Water Management District's Board of Commissioners. *See* Sections 61–16–01(5); 61–16–07; 61–21–01(2); and 61–21–03, N.D.C.C. (Supp.1979). The functions of the Board of Drainage Commis-

was no equivalent provision requiring disqualification of a member of a Water Management District's Water Resource Board in cases involving an application for a drain permit.[4]

In *Danroth v. Mandaree Public School District No. 36,* 320 N.W.2d 780 (N.D. 1982), and *First American Bank and Trust Co. v. Ellwein,* 221 N.W.2d 509 (N.D.1974), we enunciated the "rule of necessity" to deal with disqualifications by administrative officers. In *Danroth v. Mandaree Public School District No. 36, supra,* 320 N.W.2d at 783–784, we quoted the following from 1 Am.Jur.2d, Administrative Law, § 66, p. 862, concerning the "rule of necessity":

" 'There is an exception, based upon necessity, to the rule of disqualification of an administrative officer. Disqualification will not be permitted to destroy the only tribunal with power in the premises. An officer, otherwise disqualified may still act, if his failure to act would necessarily result in a failure of justice. Thus, an officer exercising judicial or quasi-judicial functions may act in a proceeding wherein he is disqualified by interest, relationship or the like if his jurisdiction is exclusive and there is no legal provision for calling in a substitute so that his refusal to act would absolutely prevent a determination of the proceeding.' "

Additionally, in *Northwestern Bell Telephone Company v. Board of Commissioners of the City of Fargo,* 211 N.W.2d 399 (N.D.1973), we held that, if a member of the city governing body passes his vote, it is considered as a vote with the majority. We noted that " . . . there is no provision in

our statute for passing votes, and an inference can be drawn that the member must vote." *Northwestern Bell Telephone Company v. Board of Commissioners of the City of Fargo, supra,* 211 N.W.2d at 402.

In the instant case, there were no disqualification provisions for a member of the Water Resource Board prior to July 1, 1985, and no provisions for passing a vote. We believe that the "rule of necessity" and our decision in *Northwestern Bell Telephone Co. v. Board of Commissioners of the City of Fargo, supra,* prevented Rudel from disqualifying himself or passing his vote. Accordingly, we conclude that Rudel's participation did not invalidate the application proceedings and his vote must be considered with the majority.

■ The appellants contend that the absence of findings of fact or other explanation of the Board's decision violates *Shaw v. Burleigh County,* 286 N.W.2d 792, 800 (N.D.1979) where we stated:

"In the future, we hope that boards of county commissioners will disclose the reasons for their decisions in order that the district courts and this court may know what the boards have determined, hence know what to review. Neither the district courts nor our court should be required to speculate as to the basis for the boards' conclusions. When faced with a problem like that before us today, a court should have the benefit of the boards' expertise. The articulation of reasons could afford a safeguard against arbitrary and careless action, and could result in greater consistency in decision

---

sioners were combined with the Board of Managers of a Water Resource District by the 1981 legislature. *See* Sections 61–21–01(2); 61–16.1–02(8), N.D.C.C.

4. Section 61–16–08.1, N.D.C.C., effective July 1, 1985, provides:

"*61–16–08.1. Appointment of alternate board member due to conflict of interest or illness.* When a member of a water resource board has a conflict of interest in a specific issue before the board or is unable to fulfill the duties of a board member because of

physical or mental illness, the county commissioners may appoint a person to serve as an alternate to the disqualified board member. If the disqualification is for a conflict of interest, the alternate board member is to serve only for the purpose of deciding the particular issue causing the conflict. If the disqualification is for physical or mental illness, the alternate board member is to be appointed by the county commissioners only for one meeting at a time."

making by boards of county commissioners."

In *Shaw v. Burleigh County, supra,* we held that a "de novo" hearing, as applied to judicial review of a decision of the Board of County Commissioners under Section 11–11–43, N.D.C.C., means a hearing to determine whether or not the Board acted arbitrarily, capriciously, or unreasonably.

Although we continue to encourage governmental subdivisions to disclose the reasons for their decisions so that district courts and this Court may know the basis for a board's decisions and hence know what to review, the language in *Shaw v. Burleigh County, supra,* relied upon by the appellants, did not establish a mandatory requirement for governmental subdivisions. In any event, the minutes of both the August 21, 1981 and the March 17, 1982 meetings disclose some of the matters considered by the Board. The Board also had several items of documentary evidence, engineering reports, and correspondence at its disposal when it made its decision. We conclude that the minutes and documentary evidence were sufficient to establish the basis for the Board's decision, and that decision was not arbitrary, capricious, or unreasonable.

The appellants also contend that the drain project and, particularly, its cost was altered by the conditions imposed by the State Engineer. Without citing any case-law or statutory authority, the appellants assert that once a drain project has been established, it cannot be changed, except for minor alterations, without resubmitting the matter for vote to those who will be assessed for the drain. We are not persuaded by the appellants' argument.

Accordingly, we affirm the district court's judgment affirming the Board's decision.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.